UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| KEVIN PETTIFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   1:10-cv-1324-SEB-TAB |
| | ) |
| JENNIFER (GARZA) DAVIS, | ) |
| *COMMUNITY CORRECTIONS* | ) |
| *Supervisor*, et al., | ) |
| | ) |
| Defendants. | ) |

**Entry Granting Defendants' Motion for Summary Judgment**

Plaintiff Kevin Pettiford alleges that the defendants, Jennifer Davis,[1] Richard Little, and Chad Stewart violated his constitutional rights while he was on house arrest. His claims are brought pursuant to 42 U.S.C. § 1983. Pettiford alleges he was denied medical care for a tooth abscess, denied his right to practice his religion and denied privileges such as job search and educational opportunities. In addition, Pettiford alleges he was denied the opportunity to shop and therefore maintain personal hygiene and cleanliness, or to have enough food. No state law claims are asserted.

The defendants, employees of Delaware County Community Corrections ("Community Corrections"), deny that they violated Pettiford's constitutional rights and argue that the restrictions placed on Pettiford were reasonable and justified by his repeated failure to abstain from illegal drugs and follow program rules. The defendants seek resolution of the claims alleged against them through the entry of summary judgment.

For the reasons explained below, the defendants' motion for summary judgment [54] is **granted.**

---

[1] Jennifer Davis is now known as Jennifer Murray. The names Jennifer Davis and Jennifer Murray both appear in the caption of the complaint, but these names identify the same person. For consistency, the name Jennifer Davis is used throughout this Entry because that was her name during the relevant time period.

## I.  Standard of Review

The motion for summary judgment in this civil rights action, as with any such motion, must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S.Ct. 1769, 1776 (2007). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. See *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing cases).

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney,* 526 F.3d at 1104 (internal citations omitted). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## II. Statement of Material Facts

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Pettiford as the non-moving party. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). Immaterial facts, legal arguments, statements made without citation to the record, or statements supported by inadmissible evidence were disregarded because "a party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission . . . ." *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003) (citing cases). See also Federal Rules of Civil Procedure 56(c); *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006); and *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible hearsay cannot be used to overcome a properly

supported motion for summary judgment). There is no reason to stray from the traditional remedy in this case.

### A. Background

On August 22, 2006, Pettiford was charged with Burglary, as a Class C Felony, and Theft, as a Class D felony, with an additional count seeking a habitual offender enhancement. On September 1, 2006, Pettiford was charged in an unrelated case with two counts of Burglary, as Class C felonies, and two counts of Theft, as Class D felonies, with an additional count seeking a habitual offender enhancement. On August 8, 2007, Pettiford pled guilty to one count of Burglary in each case, each as a Class C felony. He was sentenced to six years' imprisonment on each count, with the sentences to run consecutively. *Pettiford v. State*, 942 N.E.2d 925 (Ind.Ct.App. 2011).

On June 25, 2009, Pettiford filed a Motion for Alternative Placement, requesting placement with Community Corrections. The Delaware Circuit Court No. 4 granted Pettiford's petition for alternative placement on August 26, 2009, allowing him to serve the remainder of his sentence by electronically-monitored home detention. Pettiford was apprised of the requirements of home detention, which included completing a substance abuse treatment program, abstaining from the use of alcohol or illicit drugs, submitting to drug testing, and remaining in his home unless authorized to leave by his case manager. *Pettiford,* 942 N.E.2d at 925. An offender on home detention "is responsible for providing food, housing, clothing, medical care, and other treatment expenses." IND. CODE ' 35-38-2.5-9.

### B. Home Detention

Although Pettiford's motion for alternative placement was granted August 26, 2009, he was placed on probation daily reporting until a home detention monitoring device became available. On November 9, 2009, Pettiford began the in-home detention program authorized by IND. CODE ' 35-38-2.5-1, et seq. Pettiford signed agreements for release of confidential information and for payment of court-approved fees for the program, and of all Community Corrections home detention rules, initialing each one, as required of all persons before being placed on the home detention program. The rules were agreed to and signed by him and by Jennifer Davis on behalf of the program.

A person on home detention is confined to their residence, which is monitored by an electronic device which they are to wear at all times; it sends a signal to the program office, while the client is at or near his home, but outside of that range Community Corrections has no way to tell where the clients are or what they are doing. Any time the client is out of the range of his home, unless he is at a place either previously approved by his case manager, or responding to a personal medical emergency, he would be in violation of the agreement and rules.

Pettiford did have a landline telephone at his home while he was on the program, but he did not have a car. He traveled by bicycle.

Home detention clients are strictly forbidden from alcohol and drug use. Pettiford knew that the program required complete abstinence from drugs and alcohol. A single verified occasion of drug and alcohol use merits immediate dismissal from the home detention program and return to the Indiana Department of Correction. When Community Corrections does not opt to immediately petition for revocation of home detention, drug and alcohol violations automatically result in the revocation for thirty (30) days of all personal time, such as scheduled appointments outside the house, for any reason. The purpose of this rule is to prohibit (to the extent possible) the drug or alcohol abuser from intermingling with the public where he might procure additional drugs and alcohol. The 30-day revocation of personal time is consistent with Community Corrections' Standard Violations Sanctions (see dkt 58-8) and Special Time Out Guidelines. These guidelines were developed in early 2009 for the purposes of making administration of the rules and guidelines as uniform as possible and for giving the program flexibility to work toward rehabilitation of clients.

### C.   *Pettiford's Rule Violations*

Pettiford was on the home detention program for a total of 78 days. Because of his multiple rule violations (detailed below) Pettiford's personal time outside of his home was restricted.

Based on Pettiford's rule violations, the State filed a petition to revoke Pettiford's home detention on January 27, 2010. A warrant was issued the same day. On March 31, 2010, after an evidentiary hearing, the Delaware County Circuit Court No. 4 trial court revoked Pettiford's home detention and ordered him to serve the rest of his sentence with the Indiana Department of Correction. Specifically, the court found that Pettiford violated the terms of his electronically monitored home detention by testing positive for Cocaine on January 19, 2010, January 12, 2010, November 30, 2009, and November 16, 2009. See Original Image of Appellate Brief of Kevin T. Pettiford (August 19, 2010), available at 2010 WL 3621467, p. 8 of 15.

Pettiford appealed the revocation of his home detention. The Indiana Court of Appeals affirmed, finding that:

> Pettiford tested positive for use of cocaine on November 9, 16, and 30, 2009, and again on January 12 and 19, 2010. The November 9 test also revealed that he had used marijuana, and the November 16 test revealed use of alcohol. Pettiford admitted that he had used those substances on each occasion. On November 14, 2009, and December 9, 2009, the electronic monitoring system in Pettiford's home registered him as being out of range without permission.

4

*Pettiford v. State*, 942 N.E.2d 925 (Ind.Ct.App. 2011).[2] The Indiana Court of Appeals also found that Pettiford had been apprised of all rules including those requiring him to remain in his home unless authorized to leave by his case manager and to abstain from the use of alcohol or illicit drugs. It held that placement on home detention is a matter of grace, not right and that violation of a single condition of home detention was enough to revoke it. *Id.*

### D.     Scheduling Guidelines

Home detention clients such as Pettiford are required to report to the Community Corrections' office on a weekly basis and meet with their case manager to set out their weekly approved schedule.

Scheduling guidelines were signed by Jennifer Davis and Kevin Pettiford prior to the beginning of Pettiford's home detention. The scheduling guidelines outlined the amount of personal time generally allotted outside of the home for certain tasks. The specific guidelines relevant to this lawsuit are the following:

- <u>Store/Laundry:</u> You will be allowed 3 hours per week for the purposes of going to the store, paying bills, and doing laundry. If you are using time for laundry it MUST BE AT A LAUNDRY MAT not at a private home. Failure to provide proof WILL result in loss of this privilege for at least one month.

- <u>Church</u>:  Regularly scheduled church services. This does not include dinners, receptions, or other gatherings that are not conducted on a REGULAR BASIS.

- <u>Personal Appointments:</u> Appointments for such things as the doctor,

---

[2] Pettiford's disagreement with the state court findings of his rule violations is not sufficient to create a material fact in dispute. Pettiford's unsupported statements (why he thinks the drug tests were wrong) will not defeat summary judgment where the evidence in the record is to the contrary. See, e.g., Pettiford's Direct Examination, dkt. 58-23 at p.18 (agreeing that while on home detention he used cocaine and tested positive for cocaine on several occasions). In addition, this court will not reconsider the state court findings to determine whether these or other violations were invalid for some reason. The collateral estoppel effect of the prior state court proceedings is determined by Indiana law. *Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2009). "Under Indiana law, collateral estoppel bars subsequent litigation of an issue necessarily adjudicated in a former suit if the same issue is presented in the subsequent suit." *Id.* (internal quotations and citations omitted). A court asked to apply collateral estoppel must "determine what the first judgment decided and then examine how that determination bears on the second case." *Id.* In Pettiford's revocation proceeding, which was reviewed on appeal, the trial court concluded that Pettiford violated the terms of his home detention and these violations  resulted in the revocation of his home detention. These violations included: Pettiford's positive drug tests of November 16, and November 30, 2009, January 12 and January 19, 2010. These findings were affirmed on appeal and any challenge to these finding are barred by collateral estoppel.

>     **lawyer, haircuts, must be made in advance and written on your schedule during your office visit. <u>There will be NO CALL IN CHANGES unless it is an emergency.</u>**

**If personal time is lost because of a rule violation, the program client is generally confined to his house, except for his meetings at the Community Corrections office.**

**On the first client schedule which Case Manager Little made out with Pettiford on November 9, 2009, three (3) hours were allotted for "store time" on November 14, 2012. No additional "store time" appears on Pettiford's weekly client schedules.**

**Pettiford testified that he was not without toothpaste or soap for any extended period of time. He was out of soap for four to five days at most and out of toothpaste for "maybe two or three days." Pettiford Dep. at dkt. 58-20, p. 74. Pettiford did at all times have access to both hot and cold running water. Pettiford testified that he never ran completely out of food, although there were times when he was down to peanut butter and jelly sandwiches.**

### E.   *Medical Emergencies*

**A person on home detention can respond to a medical emergency at any time, even if not on his or her case schedule, but the person is required to provide verifying information afterwards to the case manager. Pettiford testified that he understood that he had to provide documentation of a medical emergency, if he left his home on account of one. He knew he could call an ambulance in an emergency, and then would have to provide hospital documentation.  However, at no time while Pettiford was on home detention did he provide any sort of verifying medical documentation to case managers for them to review.**

**While on home detention Pettiford developed an abscessed tooth. Pettiford could have called a dentist about the abscess and scheduled an appointment, but Pettiford states he did not have the money to pay a dentist. Pettiford testified that he went to walk-in clinics in the neighborhood twice regarding the abscessed tooth issue in December. Neither time did he get treatment, Pettiford explained, because the clinic needed income verification and a $15 payment. Pettiford eventually acquired $15 from his neighbor and went to the clinic for a third time with the payment on January 26, 2010.**

**Pettiford states that he was sanctioned on December 22, 2009, were for going to the clinic. The violation report, however, states that the violation was for failing to report to the Community Corrections office as directed and for traveling to two different locations without calling and gaining permission to do so. (dkt 58-11 at p. 3).**

Pettiford was rearrested on the petition for revocation and booked in the Delaware County Jail, on January 29, 2010. After he arrived at the Delaware County Jail, he received antibiotics and the abscessed tooth was pulled a week later.

### F.     Religious Practices

A home detention client, who is not in violation of the rules with personal time suspended, may go to regularly scheduled church services for his religious denomination. This would not generally include meetings outside the times of regular services.

Pettiford was permitted to attend what the case managers believed were regular Sunday services at Bethel AME church on November 15, 22, and 29, and December 6, 13, and 20, 2009. On these dates, Pettiford had permission to leave his home at 10:30 a.m. and was to return by 2:00 p.m. Like other personal time Pettiford received after his positive drug tests, these church activities were contrary to the standard violation sanctions and special time out guidelines, but Case Manager Little felt activities of this nature might be positive for Pettiford. Because of his rule violations, Pettiford was not permitted personal time to attend church from Sunday December 27, 2009, through January 31, 2010. Even regular church attendance involves contact with unknown numbers and members of the public, and is therefore considered personal time which is forfeited once positive drug tests are shown, under the program rules. At his revocation hearing, Pettiford told the court that while on home detention he managed to be "active" in church activities, and attended them "consistently" until his violations started.

There is no restriction on religious ministers directly visiting with home detention clients in their homes, even when they are restricted there on account of loss of personal time under the rules. Pettiford was free to have religious personnel such as ministers come to his home without time restrictions. Pettiford's assistant pastor came to his home twice during his home detention, including Christmas. Pettiford could also communicate with his ministers by telephone. He could also receive religious materials through the mail. No Community Corrections rule distinguishes between any religious denomination, church, or belief. Pettiford was never questioned about his religious beliefs or practices.

### G.     Educational Opportunities and Job Search

Community Corrections does not have any documents evidencing any agreement between Pettiford and the program regarding on-line classes at Ball State University (BSU). For classes of any kind to have been included on Pettiford's schedule, it would have to have been arranged as personal time with his case manager, to occur only during times Pettiford was not in violation of program rules. Pettiford was given permission on November 18, 2009, to visit BSU for the purpose

7

of trying to straighten out his financial aid affairs.

Job search was put on Pettiford's schedule on November 18, 2009, even though Pettiford was under a personal time restriction as a result of a positive drug test. Pettiford's case manager told him that he wanted Pettiford to complete day treatment before he did any other job searches.

### H.     Race Discrimination

Pettiford alleges in his amended complaint that two Community Corrections' clients named Joshua Wing and Justin Bush were treated better than he was because they are white and he is black.

Former Community Corrections clients Joshua Wing and Justin Bush were not home detention clients. These clients were assigned by the court to an entirely different program, the forensic drug diversion program, which is operated under a different state statutory scheme and has different program rules. Such forensic drug diversion clients are monitored more closely and personally than home detention clients, and must report to the office on a daily basis, in view of the more strictly rehabilitative purposes of that program. A different team of case managers supervise those clients. Neither Richard Little, Chad Stewart nor Jennifer Davis were case managers for Wing or Bush, nor tested them for drug or alcohol use, nor enforced program rules regarding them. Pettiford, at all times while he was under the supervision of Community Corrections was never on the forensic drug diversion.

When asked whether any of the defendants had ever made a racial slur or insult, Pettiford stated no, with the exception of Ms. Davis. When Pettiford asked permission to shop for groceries Ms. Davis told him that he should have his "drug buddies" go grocery shopping for him. Pettiford thought her reference to his "drug buddies" was a racist comment, however she did not use an explicitly racial term when talking to him (Pettiford dep., p. 78, ln. 20 - p. 81, ln. 23). Ms. Davis explained that she made this comment in an attempt to get Pettiford to speak honestly about his drug addiction.

Community Corrections Director June Kramer has never had a complaint, nor received other information, that Richard Little, Chad Stewart, or Jennifer Davis ever applied any program rule or guideline in a racially discriminatory manner, or displayed any racially oriented conduct or words of any kind.

### I.     Individual Defendants

Case managers, besides approving client's weekly schedules, monitor their client's compliance with program rules and guidelines. Pettiford was supervised by three cases managers during his time in the home detention program, including defendants Richard Little, Chad Stewart and Jennifer Davis. Richard Little was off

work for a time in December 2009, and early January 2010, and replaced by Chad Stewart, as acting case manager for Pettiford, and for one meeting by Jennifer Davis.

### Richard Little

Richard Little was the assigned case manager for Kevin Pettiford in November 2009 through January 2010. During Little's first meeting with Pettiford on November 9, 2009, Pettiford tested positive for and admitted to using both cocaine and THC. Little was aware that Pettiford could be immediately terminated from the program for this violation and that a 30-day loss of personal time is automatic for drug and alcohol use violations. However, since Pettiford had just come on the program, and stated that he knew his drug use was a problem in his criminal past, Little opted to try to work with him; he recommended Pettiford to Meridian Services for substance abuse evaluation and any recommended treatment. Little gave Pettiford unauthorized personal time on his November 2009 schedules for the same reason, to encourage him to rehabilitate.

Little was off work in December 2009 and early January 2010, and Chad Stewart substituted for him in weekly meetings with Pettiford in December, and Jennifer Davis during the first week of January. Little then resumed his duties as case manager, and conducted Pettiford's last two weekly scheduling meetings in January 2010. At both meetings, Pettiford tested positive for cocaine.

Any personal time which Little gave Pettiford after November 9, 2009, was given by Little as a personal decision, and in direct contradiction of program violation guidelines regarding positive drug tests, in Little's personal hope of working with Pettiford to encourage him in drug treatment.

### Chad Stewart

Chad Stewart is employed as a surveillance officer of Community Corrections and was also so employed in December 2009 when he substituted as case manager for Kevin Pettiford when Richard Little was off work. He met with Pettiford four (4) times to prepare his weekly schedules on December 9, December 15, December 23, and December 28, 2009, and made notes of those conferences immediately after each of those meetings. Throughout the time Stewart substituted as Pettiford's case manager, Pettiford was under automatic thirty (30) day suspension of personal time for a positive drug test recorded by Richard Little on November 30, 2009. This included any time outside Pettiford's residence, for any reason. On or about December 15, 2009, Stewart told Pettiford he could not attend a church service, due to the fact that he had lost personal time for drug violations within the last thirty (30) days.

On December 23, 2009, Pettiford did not show up for his regular appointment; he later said he had a lawyer and doctor's appointment but did not verify these alleged visits afterwards by providing documentation, as he was required to do by the program rules. Stewart gave him a rule violation for that, with further loss of personal time for another thirty (30) days.

### Jennifer Davis

During the time Pettiford was on the program, Jennifer Davis was the home detention supervisor, working under Program Director June Kramer's general supervision. As supervisor of adult home detention, Ms. Davis had no regular contact with Pettiford or involvement in the preparation of his weekly schedules.

On, January 5, 2010, Jennifer Davis substituted for case manager Richard Little to meet with Pettiford. Pettiford requested personal time to go grocery shopping, complete laundry and look for a job. Pettiford explained that he was living alone, had no family to assist him and that his only means of transportation was a bicycle. Pettiford presented a letter to Davis expressing these problems and stating "[m]y food resources at home will soon be completely depleted." Dkt 68-23. Davis testified that she discussed the letter with Program Director June Kramer. Davis and Kramer decided that Pettiford could go to stores and laundry on his way to and from the Community Corrections office from his home. [3] Davis does not recall any discussions with Kevin Pettiford about going to church or choir practice, or about medical or dental needs.

After Pettiford had positive drug tests on January 12 and 19, 2010, it was apparent to Davis that attempts to work with Pettiford on his drug issues were not successful. Therefore, she prepared and signed the petition to remove Pettiford from the program and send him back to the Department of Correction.

### June Kramer

June Kramer is a probation officer for the forensic diversion drug Court of Delaware County, Indiana, and the director of Community Corrections. Kramer does not recall a conversation with anyone working for the program about Kevin Pettiford's medical or dental issues, religious practice issues, or educational issues. In her position as director of Community Corrections when a supervisor comes to Kramer with a problem regarding a client's general personal needs, such as laundry and shopping, she might typically suggest that it be worked in during the time the subject was traveling to and from the Community Corrections' office.

---

[3] Kramer does not recall having such a conversation with Jennifer Davis concerning Kevin Pettiford, however, she has reviewed Davis' notes regarding a conversation Davis states she had with Kramer in Davis' computerized log regarding a conversation on January 5, 2010. Davis' notes thereto are consistent with the manner in which Kramer usually handles such issues. The fact that Kramer does not remember discussing Pettiford with Davis does not create a material question of fact.

### III. Discussion

**A.   *Section 1983***

Pettiford argues that even though he was on home detention and violated program rules by using illicit drugs on multiple occasions that the defendants violated his constitutional rights by not granting him personal time outside of his house to shop, do laundry, attend church services and activities, meet with a lawyer or doctor, search for a job, and take classes at BSU. Pettiford argues that these activities are rights not privileges. Privileges, he argues should be limited to activities such as going to the gym, lifting weights, playing basketball, watching a movie at the theatre, bowling or picnicking. In addition, Pettiford argues because he was permitted to attend Alcoholics Anonymous and Narcotics Anonymous meetings he should have been permitted to go anywhere he wanted – Ball State, drum practice, and unverified visits to lawyers and doctors.

In response, the defendants argue that except for his first few days on the program in November 2009, all of Pettiford's time outside of his home, for any reason, was forfeited. The defendants argue that Pettiford simply seeks to fashion a rehabilitative program for himself as if he were a free person not restricted to his home.

Pettiford's claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights; instead, it is a means for vindicating federal rights conferred elsewhere. *Graham v. Connor,* 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)). Accordingly, "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994). A corollary to this rule is that without a predicate constitutional violation one cannot make out a prima facie case pursuant to § 1983. *Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992).

As a general matter, a State is under no constitutional duty to provide substantive services for those within its border. *Youngberg v. Romeo,* 457 U.S. 307, 317 (1982). For example, "[f]ree persons are not constitutionally entitled to liver transplants or other costly medical care at public expense." *Johnson v. Daley*, 339 F.3d 582, 587 (7th Cir. 2003). However, States have extra obligations toward prisoners and must provide certain supplies such as food and medical care because imprisonment takes away their ability to fend for themselves and cuts off alternative avenues of relief. *Id.* at 588 (citing *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989)); *see also Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Domka v. Portage County, Wis.* 523 F.3d 776, 780 (7th Cir. 2008) (quoting *Sandin v. Conner*, 515 U.S. 472, 485 (1995)).

Placement in an in-home detention program under IND. CODE ' 35-38-2.5-1 et seq. is an alternative to commitment to the Department of Correction.

With these principles in mind, each of Pettiford's claims are discussed below.

### B. *Contract Claim*

Pettiford asserts that his right to shop, do laundry, attend church and church activities, meet with a lawyer or doctor, search for a job, and take classes at BSU arises out of what he describes is his binding contract with Community Corrections. The defendants are entitled to summary judgment on any contract claim brought pursuant to § 1983. Such a claim is without merit in this action because § 1983 protects plaintiffs from constitutional violations, not breaches of contract or violations of state laws or departmental regulations. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). In addition, Pettiford specifically disclaims any state law claims.

### C. *Conditions of Confinement Claims*

Pettiford alleges that the conditions of his confinement in home detention violated the Eighth Amendment=s proscription against the imposition of cruel and unusual punishments. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). It is well established that "deprivations of basic human needs like food, medical care, sanitation, and physical safety" trigger Eighth Amendment scrutiny. *James v. Milwaukee County*, 956 F.2d 696, 699 (7th Cir. 1992). However, "[t]he conditions of imprisonment, whether of pretrial detainees or of convicted criminals, do not reach even the threshold of constitutional concern until a showing is made of 'genuine privations and hardship over an extended period of time.'" *Duran v. Elrod,* 760 F.2d 756 (7th Cir. 1985) (quoting *Bell v. Wolfish*, 441 U.S. 520, 542 (1979)).

A prisoner raising an Eighth Amendment claim against a prison official therefore must satisfy two requirements. The first one is an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 114 S. Ct. at 1977.  As the Court explained in *Farmer,* "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* The second requirement is a subjective one:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

12

*Id.* at 1979. The defendants are entitled to summary judgment as to any claim related to the conditions of Pettiford's confinement. There simply is insufficient (no) evidence upon which a reasonable jury could conclude that Pettiford was denied the minimal civilized measure of life's necessities. Pettiford was never without food or water. There is no evidence that he missed a single meal. At all times he had a telephone in his home from which he could have solicited assistance. He had hot and cold running water so he could bath and wash his clothes even if for a few days he did not have soap. No human needs were denied by defendants. Shopping is not a human need. Second, there is no evidence that any defendant considered Pettiford's health at risk either because of hygiene, malnourishment or undernourishment, or other such general condition.

**D.     *Medical Issue Claim***

Pettiford alleges that he was denied the opportunity to seek treatment for an abscessed tooth and back injury in violation of the Eighth Amendment. The Eighth Amendment imposes a duty on prison officials to provide medical care to inmates. *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997). In order for an inmate to state a claim under ' 1983 for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (construing *Estelle*).

Assuming that both Pettiford's alleged back pain and tooth abscess were serious medical conditions Pettiford, unlike most prisoners, had the power and responsibility to seek his own treatment. Pettiford was not entitled to free medical care, nor were the defendants responsible for ensuring his treatment. Indiana law provides that individuals assigned to home detention are responsible for their own medical attention.  IND. CODE '  35-38-2.5-9. The home detention program had rules in place to facilitate plaintiff obtaining medical attention. All Pettiford had to do was go to a clinic or emergency room after: (1) leaving a phone message, and (2) thereafter providing written verification from the doctor or clinic thereof, of the time of the visit and the reason therefore. In the alternative, Pettiford could have used his home telephone to set up an appointment to see a doctor. Pettiford could have then presented written verification of his appointment during his Community Corrections office visit and his case manager would have written that appointment on his schedule. Pettiford never made an appointment with a dentist, he says, because of a lack of funds -- but that is not an issue caused by any individual defendant. The fact is, Pettiford sought treatment even before leaving the program by twice going to walk-in clinics in the area; the clinic's failure to treat him (because

13

of their internal requirements for certain verifications and for a $15 fee) are, again, not the responsibility of the defendants.

The defendants are entitled to summary judgment on all medical and dental issues. The defendants did not violate the constitution as a result of Pettiford's failure to personally secure the medical care he required.

### E.     *Race Discrimination Claims*

Pettiford alleges that he was discriminated against because of his race in violation of his Fourteenth Amendment rights. Under Section 1983, a plaintiff claiming a violation of the Equal Protection Clause is required to establish intentional discrimination on the part of Defendant. *Bruno v. City of Crown Point*, 950 F.2d 355, 361 (7th Cir. 1991); *Friedle v. City of Madison*, 832 F.2d 965, 971-72 (7th Cir. 1987). The Supreme Court of the United States holds that "purposeful" discrimination is an element of a Section 1983 claim based upon racial discrimination. *St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2746-7 n.1 (1993).

There is no evidence to support Pettiford's claim of race discrimination. Pettiford's attempt to show that other white clients were treated more favorably is rejected. The two comparators Wing and Bush, were not on a home detention program like Pettiford, they were on the drug diversion program, nor were they the responsibility (or in the knowledge) of any named defendant.

As for Pettiford's claim about his conversation with Jennifer Davis, he admitted in his deposition she never used racial statements or terminology. He simply interprets her reference to Pettiford's drug-supplying friends—"drug buddies" as a racial reference. This is not a reasonable conclusion. It is uncontradicted that when Davis and Pettiford had this conversation, he was getting drugs from his friends.

### F.     *Religious Practice Claims/ First Amendment Claim*

Pettiford alleges that the defendants infringed upon his right to practice his religion in violation of the First Amendment, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000(b)(b)(1)(a), and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., which confers greater religious rights on prisoners than the free exercise clause has been interpreted to do. See 42 U.S.C. § 2000cc–1; *Cutter v. Wilkinson*, 544 U.S. 709, 714–17 (2005).[4]

---

[4] The plaintiff doesn't mention RLUIPA, but is proceeding pro se and in such cases we interpret the free exercise claim to include the statutory claim. *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009).

14

The defendants are entitled to summary judgment as to both statutory claims. Claims under RFRA must be denied because RFRA was invalidated as an enforcement vehicle against the states by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 516-517 (1997)). Congress responded by enacting RLUIPA in 2000. See *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir. 2008). But RLUIPA no longer does Pettiford any good either. Damages against the defendants in their official capacities are barred by the state's sovereign immunity and RLUIPA does not create a cause of action against state employees in their personal capacity. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *Nelson v. Miller*, 570 F.3d 868, 886–89 (7th Cir. 2009). Thus, Pettiford is left with his personal-capacity damages claim under § 1983.

The First Amendment states that "Congress shall make no law respecting an establishment of religion. . . ." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) teaches that a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. The Establishment Clause also prohibits the government from favoring one religion over another without a legitimate secular reason. *See Nelson v. Miller*, 570 F.3d 868, 881 (7th Cir. 2009) (citing *Linnemeir v. Bd. of Trustees of Purdue Univ.*, 260 F.3d 757, 759 (7th Cir. 2001); *Metzl v. Leininger*, 57 F.3d 618, 621 (7th Cir. 1995) ("The First Amendment does not allow a state to make it easier for adherents of one faith to practice their religion than for adherents of another faith to practice their religion, unless there is a secular justification for the difference in treatment.")). In addition, although prisoners enjoy rights under the free-exercise clause of the First Amendment many decisions hold that these rights are subject to limits appropriate to the nature of prison life. Restrictions are permissible if they are reasonably related to legitimate penological objectives. *Vinning-El v. Evans*, 657 F.3d 591, 592-593 (7th Cir. 2011) (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987); *see also, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348–49 (1987)).

In this case, the defendants did not violate either the Establishment Clause or the Free Exercise Clause of the First Amendment. The defendants had a neutral reason for restricting Pettiford's attendance at church services and church related activities; specifically, Pettiford's repeated drug use rule violations. The loss of personal time to mingle with the public upon violation of program rules is reasonable given that the special restrictions of Indiana home detention are required to assure the public is not harmed by the offender. *See Kopkey v. State*, 743 N.E.2d 331, 337 (Ind.App. 2001), trans. denied, 743 N.E.2d 331 (Ind. 2001). In addition, the restrictions on personal time seek to prohibit (to the extent possible) the drug or alcohol abuser from intermingling with the public where he might procure additional drugs and alcohol.

Prior to the rule violations Pettiford was active in church activities. To attend services again, all Pettiford had to do was be free of a violation of program rules for

thirty (30) days. He then could have resumed going to church services where members of the general public were present, without the security concerns that Community Corrections legitimately and objectively held because of plaintiff's repeated violations.

Pettiford argues that he was not a threat to society, which he supports by pointing out that he was allowed to mingle with (despite his drug violations) other individuals seeking treatment specifically for drug and alcohol use in a supervised context: at a drug addiction recovery meeting. This argument is frivolous. Pettiford repeatedly used drugs while on home detention. It was reasonable for the defendants to want to work with him by allowing him to seek treatment for his addiction, but not permit him to intermingle with unidentifiable adults and children who might attend church.

In addition, even when Pettiford was restricted to his home under 30 days violation he had alternative means of exercising his religion. There were no restrictions limiting religious representatives visiting his home, they could have come in at any time without restriction or talked to Pettiford on the phone any hour of the day. In fact, Pettiford's assistant minister visited his home twice, including Christmas. Pettiford was also free to accept unlimited religious materials through the mail.

In sum, Pettiford could have attended any and all church services if he was not using drugs. The restrictions placed on Pettiford were temporary, neutral, and provided Pettiford with alternative means of exercising his religious beliefs. Under these circumstances the defendants are entitled to judgment as a matter of law on the First Amendment claim.

## G. Qualified Immunity

The defendants seek qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-1245 (2012) (internal quotations and citations omitted). Under the circumstances discussed above, there was no violation of Pettiford's constitutional rights and therefore the defendants are entitled to summary judgment. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Our inquiry here is at an end.

## IV. Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118

S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Here, Pettiford has not identified a genuine issue of material fact as to his claims and the defendants are entitled to judgment as a matter of law. The motion for summary judgment [54] is therefore **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 07/03/2012

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution:**

**Kevin Pettiford**
**852730**
**Indianapolis Re-Entry Educational Facility**
**401 North Randolph Street**
**Indianapolis, IN 46201**


**Michael Roy Morow**
**mmorow@stephlaw.com**